UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JAMES ADAMS #823706,

     Plaintiff,

v.

UNKNOWN HARJU and ROBERT
NIVEN,

     Defendants.

_____/

Case No. 2:20-cv-100

Hon. Paul L. Maloney
U.S. District Judge

## REPORT AND RECOMMENDATION

### I.    Introduction

This Report and Recommendation (R&R) addresses the motions for summary judgment filed by Defendant Niven (ECF No. 39), Defendant Harju (ECF No. 40), and Plaintiff Adams (ECF No. 46).

Plaintiff — state prisoner James Adams — filed suit pursuant to 42 U.S.C. § 1983 on July 1, 2020.  In his unverified complaint, Adams asserted that while he was confined at the Baraga Correctional Facility (AMF) in Baraga, Michigan, Dr. Robert Niven and Qualified Mental Health Professional (QMHP) Harju retaliated against him and acted with deliberate indifference to his serious psychological needs. Specifically, Adams said that in June of 2018, he requested to be placed back on mental health medication.  (ECF No. 1, PageID.3.)  On June 22, 2018, Adams attended a psychiatric evaluation with Dr. Niven by video.  (*Id.*)  But, according to Adams, Niven denied Adams's request for medication in retaliation for Adams

assaulting a corrections officer.  (*Id.*)  When Adams approached QMHP Harju after the evaluation, Harju allegedly stated: "Do you think we [are] about to put you back on your medication after what you did to that officer?"  (*Id.*)

On August 13, 2020, this Court dismissed Adams's retaliation claim, leaving only Adams's deliberate indifference claim against Dr. Niven and QMHP Harju for failing to provide him with mental health medication.  (ECF No. 5, PageID.30 (Opinion); ECF No. 6, PageID.31 (Order).)

The parties now move for summary judgment.  Dr. Niven argues that he is entitled to summary judgment because Adams has not established that the care he received in lieu of medication was grossly inadequate.  (ECF No. 39, PageID.144-147.) QMHP Harju asserts the same but adds that Harju is not authorized to prescribe medication.  (ECF No. 41, PageID.211-215.)  Harju also argues that he is entitled to qualified immunity.  (*Id.*, PageID.215.)  Adams claims that he has a history of mental health conditions, that Defendants knew of the history, and that Defendants refused to treat Adams because he stabbed an officer at his previous facility.  (ECF No. 47, PageID.331-332.)

The undersigned respectfully recommends that the Court grant Defendants' motions for summary judgment and deny Adams's motion for summary judgment. The record here demonstrates that there are no genuine issues of material fact; the record reflects that Niven and Harju provided Adams with continuous care and utilized their professional judgment in determining that Adams did not require

psychotropic medication.  As such, Defendants are entitled to summary judgment as to Adams's deliberate indifference claim.

## II.    Factual Allegations

Adams provided the Court with a declaration setting forth his allegations. (ECF No. 47-5.)  Adams says that in June of 2018, he was dealing with "problems that [he] could not handle or cope with," including "depression, anxiety, blackouts, anger, personality disorder, hearing voices, [and] many other problems emotionally." (*Id.*, PageID.368.)  Adams says that he has been in segregation for four years.

According to Adams, he has been prescribed medication since he was a child. (*Id.*)  Adams says that he was prescribed Seroquel and Wellbutrin prior to entering into the custody of the Michigan Department of Corrections (MDOC) but that he was taken off of the medications when he arrived at a facility that did not prescribe them. (*Id.*)

On March 28, 2018, Adams stabbed a corrections officer while he was incarcerated at Marquette Branch Prison (MBP) in Marquette, Michigan.  (*Id.*, PageID.369.)  Adams claims that he blacked out and does not remember stabbing the officer, but that he was later told about the incident.  Adams says that he was transferred to AMF the same day, and that he began requesting medication.  (*Id.*) Adams states that he has previously attempted suicide.

On May 4, 2018, Adams says that the told QMHP Harju that he "felt harmful" and that Harju responded by telling Adams to kill himself and that Adams "had nothing coming" because of the incident with the corrections officer at MBP.  (*Id.*)  For

the next few days, all Adams could hear was Harju telling him to kill himself.  On May 10, 2018, Adams attempted suicide with a razor during his shower.  (*Id.*)

Adams reports that once Dr. Niven was made aware of Adams's circumstances, Niven also refused to help Adams.  On May 31, 2018,[1] Niven conducted a psychiatric evaluation by video.  (*Id.*)  Adams told Niven about his symptoms, but Niven allegedly focused more on Adams's gang activity and the incident at MBP than on Adams's mental health.  Adams says that Niven "had not one real reason to deny [him] help," but that he did anyways.  (*Id.*)  Adams also alleges that Niven improperly relied on AMF staff who told Niven that Adams was normal.  In his complaint, Adams alleges that he approached QMHP Harju following his psychiatric evaluation, and that Harju stated: "Do you think we [are] about to put you back on medication after what you did to that officer[?]" (ECF No. 1, PageID.3.)

Dr. Niven is a board-certified psychiatrist.  (ECF No. 42, PageID.310.)  In an affidavit, Niven says that he evaluates a patient's need for treatment and medication by obtaining a thorough history from the patient.  Dr. Niven says that he considers "family history, social and childhood history, health history, mental health history, and current mental health complaints" as well as "incarceration history, a history of the patient's present illness, and their current complaints."  (*Id.*, PageID.310-311.)

When Dr. Niven evaluated Adams on May 31, 2018, Niven asked Adams why he felt he needed psychiatric help.  (*Id.*, PageID.311.)  Adams told Niven that he

---

[1]     It appears that this is the evaluation Adams referrs to in his complaint, though he stated it occurred on June 22, 2018.  (ECF No. 1, PageID.3.)

started hearing voices before he came to prison.  Dr. Niven determined that it was highly doubtful that Adams was actually experiencing hallucinations, and highly lightly that Adams was fabricating some of his complaints.  Dr. Niven says that QMHPs, nursing staff, and custodial staff all reported that Adams behaves normally. (*Id.*)

Dr. Niven further affirms that he asked Adams about gang activity and the incident at MBP.  (*Id.*, PageID.312.)  Niven says the inquiries were relevant to his evaluation, as Adams claimed the voices were responsible for the incident. Ultimately, Niven says that he treated Adams in accordance with his medical judgment.  Niven asserts that his treatment of Adams was not motivated by the incident at MBP.  (*Id.*)

In addition to his own affidavit, Niven provided the Court with a portion of Adams's October 14, 2021 deposition.  There, Adams was asked whether he had medical evidence that verified that Dr. Niven's treatment caused him harm.  Adams responded: "No, I don't have no severity — anything — any harm from his allegation. The only thing I can say is that I'm still being denied. . . . I'm suffering from something, like I say, from here.  I'm still being denied help."  (ECF No. 39-3, PageID.200.)

QMHP Harju also provided the Court with an affidavit.  (ECF No. 41-2.) There, Harju explained that he is a Licensed Master Social Worker (LMSW), and that he does not have legal authority to prescribe medication.  (*Id.*, PageID.221.)  Harju says that AMF QMHPs provided Adams with continuous mental health care during the

relevant time period,[2] but that Adams did not "exhibit signs or symptoms of psychosis or a major mental illness requiring psychotropic medication." (*Id.*, PageID.221.) Harju explains that despite the absence of signs that Adams needed psychotropic medication, Harju still referred Adams for a comprehensive psychiatric evaluation. Harju says that he never told Adams to kill himself or refused Adams mental health care. (*Id.*)

### III.   Adams's Medical Records

Niven, Harju, and Adams all provided portions of Adams's medical records. Because the records overlap, the undersigned cites only to the records provided by QMHP Harju.

On March 1, 2013, Adams underwent his first psychiatric evaluation in MDOC custody. (ECF No. 41-3, PageID.274.) The evaluation was conducted by Dr. David J. Forsythe. Forsythe noted that when Adams arrived at the Charles Egeler Reception & Guidance Center on February 12, 2013, he arrived with prescriptions for Wellbutrin and Seroquel. (*Id.*) But on February 13, 2013, Adams was caught "cheeking"[3] the Wellbutrin. He continued cheeking the medication until another doctor discontinued both the Wellbutrin and the Seroquel on February 20, 2013.

Adams reported that he was prescribed the medications at the Wayne County Jail after he complained of his inability to sleep or focus. (*Id.*) Adams began cheeking the Wellbutrin because he did not want it, but was told that he had to take it, or he

---

[2]   Presumably, May and June of 2018.
[3]   In other words, Adams was pretending to swallow the medication.

would be put in segregation.  (*Id.*, PageID.275.)  Adams said that he never tried to trade, sell, or otherwise misuse the medication; he simply did not want to take it.

During this evaluation, Adams also reported that he was prescribed Ritalin and Concerta for Attention-Deficit/Hyperactivity Disorder when he was seventeen, but that he had not taken psychotropic medication since (that is, until he was prescribed Wellbutrin and Seroquel at the Wayne County Jail).  (*Id.*)

When asked about psychiatric disorders or symptoms, Adams denied "persistent sleeping difficulties, anhedonia, anergia, dysphoria, diumal variation in mood, hopelessness, worthlessness, helplessness, thoughts death, dying, or suicide." (*Id.*)  Dr. Forsythe noted no history of psychoticism including hallucinations or delusions, and no family history of psychiatric disorders, hospitalization, or suicide.

Dr. Forsythe diagnosed Adams with Cannabis Dependence, and Anti-social Personality Disorder.  (*Id.*, PageID.277.)  Forsythe recommended substance abuse treatment but determined that Adams did not need to be placed in an outpatient treatment program.  (*Id.*)

Adams's medical records then jump to April 16, 2018.  On that date, QMHP Michael Beaudoin visited Adams after Adams asked for medication to manage his sadness and the voices inside his head.  (*Id.*, PageID.224.)  Beaudoin noted that while Adams said that he constantly heard voices in his head, Adams could not describe the voices.  At the time, Adams did not express suicidal ideation.  (*Id.*, PageID.225.)

On May 4, 2018, QMHP Harju visited Adams in segregation.  (*Id.*, PageID.227.) Harju noted that Adams did not appear to be experiencing internal stimuli despite

Adams's reports that he was hearing voices.  The record reflects that Adams denied experiencing suicidal or homicidal ideation, as well as any intent to harm himself or others.  (*Id.*)

On May 7, 2018, Adams again requested medication and began implying that if he did not receive medication, someone would get hurt.  (*Id.*, PageID.229.)  Adams claimed that Bupropion (Wellbutrin) previously helped him with the voices in his head, but QMHP Harju noted that Bupropion is not an antipsychotic and that Adams's records demonstrate that Adams was not actually taking the medication when it was prescribed.  (*Id.*)  Adams also said that he could not sleep, but when Harju tried to talk to Adams about sleep hygiene, Adams dismissed Harju.  Harju noted that Adams had provided QMHPs at AMF with contradictory accounts of the symptoms that he was experiencing.  (*Id.*)  Although Adams implied that he would hurt someone if he was not put on medication, Harju reported that Adams did not express suicidal or homicidal ideation. (*Id.*, PageID.230.)

On May 10, 2018, Adams began engaging in self-harm, using a razor to cut himself while taking a shower.  (*Id.*, PageID.233.)  Adams initially claimed that he did not know who cut him.  The cut required sutures, but the nurse practitioner regarded the wound as superficial.  (*Id.*)  When QMHP Harju visited Adams, Adams refused to speak with him.  Harju noted that a prisoner across the hall from Adams had recently received a "ride out"[4] for engaging in behavior similar to Adams's, but nevertheless determined that Adams was at a moderate risk of committing suicide.

---

[4]      Presumably, a transfer to another facility.

(*Id.*)  At this point, Harju issued a Mental Health Management Plan for Adams, stating that Adams was at moderate risk of suicide or self-injury, and needed to be placed in an observation cell.  (*Id.*, PageID.231.)  The plan mandated one-on-one supervision of Adams while showering and brushing his teeth and directed officials not to give Adams any sharp objects.  (*Id.*)

Adams attempted to harm himself again on May 11, May 13, and May 15, 2018. (*Id.*, PageID.235-240.)  Harju evaluated Adams's risk of suicide and self-harm on each May 11, May 14, and May 15, noting that there was no evidence of psychosis.  (*Id.*, PageID.235, 238, 240.)  On May 11 and May 14, staff informed QMHP Harju that Adams was eating and sleeping normally.  (*Id.*, PageID.235, 238.)  During the May 14 visit, Adams reported that the voices in his head were instructing him to hurt himself, and that he was not responsible for any of his behavior since entering into MDOC custody.  Adams again requested medication to "help [him] do his time." (*Id.*, PageID.238.)

During the May 15 visit, staff informed Harju that Adams refused to comply with security demands or take his antibiotics.  (*Id.*, PageID.240.)  Staff also told Harju that Adams's behavior was being influenced by a gang member in Adams's housing unit.  Adams told Harju that if Adams did not get his medication, someone would die. Harju noted that Adams was not exhibiting signs of psychosis, but that he was exhibiting anti-social traits during this visit.  (*Id.*)

On May 16, 2018, Adams began a hunger strike.  (*Id.*, PageID.242.)  QMHP Beaudoin visited Adams's cell and attempted to speak with him, but Adams told

Beaudoin that there was nothing to talk about.  When QMHP Harju visited on May 17, 2018, Adams dismissed him as well.  (*Id.*, PageID.244.)  Nursing staff told Harju that Adams attributed his refusal to eat to the voices in Adams's head.  Nursing staff informed Adams about the risks associated with refusing to eat.  (*Id.*)

On May 18, 2018, Adams began eating again.  (*Id.*, PageID.246.)  When QMHP Harju visited Adams, Adams berated Harju, threatening Harju and calling Harju names.  (*Id.*)  Adams reiterated that if he did not get medications soon, someone would get hurt.  Harju told Adams that Harju was going to refer Adams for a comprehensive psychological examination, which seemed to calm Adams down.  (*Id.*, PageID.247.) Harju noted that Adams did not present signs of psychosis, and that there was no indication that Adams was responding to internal stimuli during the interaction. (*Id.*)

QMHP Harju continued evaluating Adams's risk of committing suicide over the course of the next few weeks.  Harju visited Adams on May 20, May 22, May 24, May 30, and June 1, 2018.[5]  (*Id.*, PageID.248-257, 290.)  Though Adams was not engaging in self-harm, Adams continued to report experiencing hallucinations and suicidal ideation through May 30, 2018.  (*Id.*, PageID.248, 250, 254, 256, 257.)  Harju noted that Adams did not display any overt signs of distress or psychosis during these visits.  (*Id.*)  On June 1, 2018, Adams reported that he was no longer experiencing hallucinations or the desire to harm himself.  (*Id.*, PageID.290.)  Adams noted that

---

[5]     QMHP Beaudoin also visited Adams on May 29, 2019.  (ECF No. 41-3, PageID.256.)

there were no signs of psychosis, or major mood disorder during this visit.  (*Id*.)
Because Adams "contract[ed] for safety," Harju moved Adams from moderate risk to
intermediate risk of self-harm or suicide and issued a new Mental Health
Management Plan.  (*Id*., PageID.288-290.)

Meanwhile, Adams was seen by Dr. Robert Niven on May 31, 2018 for a
psychiatric evaluation.  (*Id*., PageID.281-283.)  During the evaluation, Adams said
that he was feeling down and angry about his sentence, that he was hearing voices,
and that he had been blacking-out a lot.  (*Id*., PageID.281.)  Adams reported that the
voices began before he came to prison.  (*Id*., PageID.282.)  Niven noted that Adams's
responses throughout the evaluation were often vague.  (*Id*.)  Niven also noted that
there was no evidence that Adams was experiencing internal stimuli during the
evaluation.  (*Id*., PageID.283.)  Adams did not report suicidal or homicidal ideation.
Niven determined that it was "highly doubtful" that Adams was experiencing
auditory hallucinations, and "highly likely" that Adams was fabricating some of his
symptoms.  (*Id*.)  Niven considered many of the records summarized above, including
Adams's psychiatric evaluation from 2013.  When Niven told Adams that he was
going to administer a psychological test at some point in the future, Adams
complained about not receiving medication in the meantime.   (*Id*.)  Niven pointed
out that Adams had not received mental health medication in over five years.

On June 7 and June 13, 2018, QMHP Harju visited Adams in accordance with
his new Mental Health Management Plan.  (*Id*., PageID.292-295.)  Harju noted that
Adams did not appear to be experiencing distress, and that Adams reported that he

was not experiencing hallucinations or suicidal or homicidal ideation.  (*Id.*, PageID.292, 294.)  During the June 13, 2018 visit, Harju evaluated Adams's suicide risk as low.  (*Id.*, PageID.294.)

On July 6, 2018, Adams was visited in segregation by QMHP Beaudoin.  (*Id.*, PageID.296-297.)  Beaudoin noted that Adams appeared healthy, and that there were no signs of a major mood disorder.  Adams reported that he was not experiencing any psychological problems.  (*Id.*)  But on September 27 and October 3, 2018, QMHP Andrew Eastham visited Adams, and Adams again complained that he was not receiving mental health medication.   (ECF No. 41-4, PageID.299, 301.)  During the October 3 visit, Eastham noted that Adams did not manifest any symptoms of psychosis, that he did not respond to any internal stimuli, and that Adams did not meet criteria for outpatient treatment.  (*Id.*, PageID.301.)  Eastham tried to offer Adams some handouts, but Adams refused mental health interventions, stating that he just wanted his medication.  (*Id.*)

## IV.    Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421

F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion.  *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## V.      Deliberate Indifference

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes.  U.S. Const. amend. VIII.  It obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976).  The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner.  *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).  This includes a prisoner's serious psychological needs, "especially when they result in suicidal tendencies."  *Comstock*, 273 F.3d at 703 (quoting *Horn by Parks v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)).  A claim for the deprivation of adequate medical care has an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious.  *Id.*  In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.  *Id.*

The Sixth Circuit distinguishes "between cases where the complaint alleges a

complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).

To succeed on a claim of deliberate indifference, a prisoner who has received medical attention "must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell*, 553 F. App'x at 605 (quoting A*lspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)). And the prisoner must place medical evidence into the record verifying the detrimental effect of the inadequate treatment. *See Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001) (establishing that a prisoner must submit verifying medical evidence to support a deliberate indifference claim based on treatment delay); *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 898 (6th Cir. 2004) (explaining that a prisoner must submit verifying medical evidence to support a deliberate indifference claim based on inadequate treatment).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207

14

F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834).  Deliberate indifference

"entails something more than mere negligence," *Farmer*, 511 U.S. at 835, but can be

"satisfied by something less than acts or omissions for the very purpose of causing

harm or with knowledge that harm will result."  *Id*.  Under Farmer, "the official must

both be aware of facts from which the inference could be drawn that a substantial

risk of serious harm exists, and he must also draw the inference."  *Id*. at 837.  The

subjective component was recently summarized in *Rhinehart v. Scutt*, 894 F.3d 721

(6th Cir. 2018).  There, the court of appeals stated the following:

> A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference.  Instead, the plaintiff must show that each defendant acted with a mental state "equivalent to criminal recklessness."  This showing requires proof that each defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it.

> A plaintiff may rely on circumstantial evidence to prove subjective recklessness: A jury is entitled to "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." And if a risk is well-documented and circumstances suggest that the official has been exposed to information so that he must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge.

> But the plaintiff also must present enough evidence from which a jury could conclude that each defendant "so recklessly ignored the risk that he was deliberately indifferent to it."  A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful.  A doctor, after all, is bound by the Hippocratic Oath, not applicable to the jailor, and the physician's job is to treat illness, not punish the prisoner.  Accordingly, when a claimant challenges the adequacy of an inmate's treatment, "this Court is deferential to the judgments of medical professionals."  That is not to say that a doctor is immune from a deliberate-indifference claim simply because he provided "some

15

treatment for the inmates' medical needs." But there is a high bar that a plaintiff must clear to prove an Eighth Amendment medical-needs claim: The doctor must have "consciously expos[ed] the patient to an excessive risk of serious harm."

*Id.* at 738–39 (6th Cir. 2018) (internal citations omitted).

Adams claims that Dr. Niven and QMHP Harju improperly denied him psychotropic medication around May and June of 2018.[6]

Adams's medical records reflect that Adams engaged in self-injurious behaviors several times from May 10, 2018 to May 18, 2018. (ECF No. 41-3, PageID.235-247.) From May 10, 2018 to May 29, 2018, Adams reported experiencing suicidal ideation. (*Id.*, PageID.231-247.) As recognized above, psychological needs manifesting in suicidal tendencies constitute serious medical needs. *Comstock*, 273 F.3d at 703; *Horn by Parks*, 22 F.3d at 660; *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 482-83 (6th Cir. 2020) ("A plaintiff meets the objective prong of the Eighth Amendment analysis by showing that the inmate showed suicidal tendencies during the period of detention.").

But even accepting that Adams had serious psychological needs during this time, Adams's medical records demonstrate that mental health staff at AMF provided Adams with continuous care from May 4, 2018 to June 13, 2018. (*Id.*, PageID.227-294.) And staff followed up with Adams in July, September, and October of 2018. (*Id.*, PageID.296-297; ECF No. 41-4, PageID.299-301.) During these visits, staff

---

[6]     Adams's allegation that QMHP Harju told him to kill himself was not a part of his complaint.  That allegation is the basis for Adams's deliberate indifference claim in another case before this Court, *Adams v. Harju*, W.D. Mich. Case No. 2:20-cv-98.

(usually QMHP Harju) monitored Adams's complaints, Adams's risk of self-harm or suicide, and whether Adams was showing any signs of psychosis.  On numerous occasions, QMHP Harju documented Adams's requests for medication, along with Adams's mental health diagnoses and his history of using, and refusing, mental health medication.  (ECF No. 41-3, PageID.229, 238-239.)  On occasion, Adams refused to speak with mental health staff.  (*Id.*, PageID.242-245.)  On at least two occasions, staff attempted to provide Adams with resources that Adams refused to accept.  (*Id.*, PageID.229; ECF No. 41-4, PageID.301.)  On May 31, 2018, Dr. Niven met with Adams for a psychiatric evaluation.  (*Id.*, PageID.281-283.)

Because QMHP Harju, Dr. Niven, and other mental health staff at AMF provided Adams with mental health care, Adams had to place medical evidence on the record that at least created a genuine issue as to the adequacy of the treatment.  *Blackmore*, 390 F.3d at 898.  He plainly did not.  Indeed, when Adams was deposed by Dr. Niven, Adams conceded that he had no such evidence.  (ECF No. 39-3, PageID.200.)  And Adams's own conclusory allegations are insufficient; differences in judgment between a prisoner and medical professionals do not state a claim of deliberate indifference.  *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996).  As such, the undersigned respectfully recommends that the Court grant Defendants' motions for summary judgment.

## VI.   Qualified Immunity

QMHP Harju also argues that he is entitled to qualified immunity because he did not violate Adams's clearly established rights.  (ECF No. 41, PageID.215.)  "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant officer violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The analysis entails a two-step inquiry.  *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).  First, the court must "determine if the facts alleged make out a violation of a constitutional right."  *Id.*  (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (1982)).  Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it."  *Id.*  (citing *Pearson*, 555 U.S. at 232).  A court may address these steps in any order.  *Id.*  (citing *Pearson*, 555 U.S. at 236).  A government official is entitled to qualified immunity if either step of the analysis is not satisfied.  *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

18

In applying the first step of the qualified immunity analysis, a court must identify "the specific constitutional right allegedly infringed" and determine whether a violation occurred. *Graham v. Connor*, 490 U.S. 386, 394 (1989).  The court considers the state of the law at the second step.  As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).  As explained by the Supreme Court:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,' " *al–Kidd*, *supra*, at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U.S., at 666, 132 S.Ct. 2088. Otherwise, the rule is not one that "every reasonable official" would know. *Id.*, at 664, 132 S.Ct. 2088 (internal quotation marks omitted).
>
> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. ——, ——, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (per curiam). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, *supra*, at 2023 (internal quotation marks and citation omitted). A rule is too general if

> the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson*, *supra*, at 641, 107 S.Ct. 3034. In the context of a warrantless arrest, the rule must obviously resolve "whether 'the circumstances with which [the particular officer] was confronted ... constitute[d] probable cause.'" *Mullenix, supra*, at 309 (quoting *Anderson, supra*, at 640–641, 107 S.Ct. 3034; some alterations in original).

*District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018).

Because the undersigned finds that there are no genuine issues of material fact and that QMHP Harju did not act with deliberate indifference to Adams's serious medical needs, the undersigned finds that QMHP Harju is entitled to qualified immunity.

## VII.   Recommendation

The undersigned respectfully recommends that the Court grant Defendants' motions for summary judgment and deny Adams's motion for summary judgment. There are no genuine issues of material fact; the record reflects that Niven and Harju provided Adams with continuous care and utilized their professional judgment in determining that Adams did not require psychotropic medication.   As such, Defendants are entitled to summary judgment as to Adams's deliberate indifference claim.


Date: August 26, 2022                         /s/ *Maarten Vermaat*
                                              MAARTEN VERMAAT
                                              U.S. MAGISTRATE JUDGE

## <u>NOTICE TO PARTIES</u>

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).